

> Signed/Docketed
> October 24, 2011

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF COLORADO
### The Honorable Michael E. Romero

| | | |
|---|---|---|
| In re: | ) | |
| | ) | Case No. 11-24718 MER |
| HT PUEBLO PROPERTIES, LLC | ) | |
| | ) | Chapter 11 |
| | ) | |
| Debtor. | ) | |

## ORDER

THIS MATTER comes before Court on the *Motion to Prohibit Use of Cash Collateral* filed by Zions First National Bank ("Zions"), and the *Motion for Order Authorizing Use of Cash Collateral* filed by Debtor HT Pueblo Properties, LLC ("Debtor"). Having considered the pleadings, the facts to which the parties agreed, and the legal arguments presented, the Court makes the following findings of fact and conclusions of law.

## JURISDICTION

The Court has jurisdiction over this matter under 28 U.S.C. §§ 1334(a) and (b) and 157(a) and (b). This is a core proceeding under 28 U.S.C. § 157(b)(2)(M), as it concerns the use of cash collateral.

## BACKGROUND FACTS

The Debtor filed its voluntary Chapter 11 petition on June 21, 2011 (the "Petition Date"). The Debtor owns a Ramada Inn in Pueblo, Colorado, which it values at approximately $2.1 million. According to the Debtor's schedules, it has approximately $5.2 million of debt on the property, of which $3.1 million is held by Zions, and $1.7 million is held by the Small Business Administration.

It is undisputed Zions holds a first lien on all the Debtor's real and personal property, as well as an assignment of rents. Zions claims room rents are cash collateral subject to its lien interest and does not consent to the Debtor's use of these room rents to fund operating expenses. Zions has also filed a notice of its non-consent under 11 U.S.C. § 546(b).[1]

---

[1] Unless otherwise specified, all future statutory references in the text are to Title 11 of the United States Code.

The Debtor, however, asserts its use of room rents and other income is necessary and proper.[2] The Debtor's Motion for Authorization for Use of Cash Collateral seeks leave to use room rents and other income ("Operating Capital") on deposit in its debtor-in-possession account, stating its business depends upon uninterrupted access to those funds. The Debtor proposes an operating budget, and plans to continue operation of the motel throughout this case, anticipating a plan of reorganization providing for the continuation of the Debtor's business. According to the Debtor, on the Petition Date it had approximately $8,000 in its checking account, and as of June 29, 2011, it had approximately $26,141.88 in its debtor-in-possession account. The Debtor anticipates it will replace the cash and cash equivalents in the course of its daily operations and, therefore, the collateral base will remain stable.

The Debtor filed a new Motion to Use Cash Collateral on August 26, 2011. According to that motion, the Debtor had not yet completed its investigation to determine whether Zions held a perfected security interest against the Operating Capital on the Petition Date, and specifically preserved the argument that the Operating Capital is not cash collateral under the provisions of § 363. Zions has indicated its willingness to continue the interim use of cash collateral pending resolution of the matter.

The parties do not dispute Zions holds a Promissory Note dated May 30, 2007, in the face amount of $2,614,800.[3] The Promissory Note is secured by a Deed of Trust also dated May 30, 2007 and was recorded in the office of the Pueblo County Clerk and Recorder on June 4, 2007.[4] Zions also holds an Assignment of Rents dated May 30, 2007, which was recorded with the Pueblo County Clerk and Recorder on June 7, 2007.[5] Additionally, as part of this transaction, the Debtor executed a Commercial Security Agreement ("Security Agreement").[6]

In connection with the Security Agreement, financing statements were filed with the Colorado Secretary of State's office on June 5, 2007 (the "Financing Statements").[7] Zions asserts, and the Debtor does not dispute, that the Note was originally made payable to Choice Bank. However, the Note was sold, endorsed, and delivered to Zions on June 8, 2007, pursuant to an Assignment of Deed of Trust and Assignment of Assignment of Rents, both of which were

---

[2] The Debtor cites the well-known case, *Chaussee v. Morning Star Ranch Resorts Co.*, 64 B.R. 818, 821 (Bankr. D. Colo. 1986).

[3] Debtor's Brief, Exhibit 1.

[4] Zions' Brief, Exhibit 2.

[5] Debtor's Brief, Exhibit 2; Zions' Brief, Exhibit 3.

[6] Debtor's Brief, Exhibit 3;  Zions' Brief, Exhibit 4.

[7] Zions' Brief, Exhibits 5 and 6.

recorded in Pueblo County, and pursuant to assignments of the Financing Statements, which assignments were filed with the Colorado Secretary of State's office.[8]

## THE LOAN DOCUMENTS

- The Deed of Trust provides:

> For valuable consideration, Grantor [Debtor] hereby irrevocably grants, transfers, and assigns to [the Pueblo County Public Trustee] for the benefit of Lender [Zions] as Beneficiary all of Grantor's right, title, and interest in and to the following described real property, together with all existing or subsequently erected or affixed buildings, improvements and fixtures, all easements, rights of way, and appurtenances; all water, water rights and ditch rights, (including stock in utilities with ditch or irrigation rights); and all other rights, royalties, and profits relating to the real property, including without limitation all mineral, oil, gas, geothermal, and similar matters (the "Real Property") located in Pueblo County, State of Colorado [legal description omitted].

> Grantor presently assigns to Lender (also known as Beneficiary in this Deed of Trust) all of grantor's right, title, and interest in and to all present and future leases of the property and all Rents from the Property. In addition, Grantor grants to Lender a Uniform Commercial Code security interest in the Personal Property and Rents.[9]

The Deed of Trust goes on to define "Personal Property" as

> all equipment, fixtures, and other articles of personal property, now or hereafter owned by Grantor, and now or hereafter attached or affixed to the real property; together with all accessions, parts, and additions to, all replacements of, and all substitutes for, any such property; and together with all proceeds (including without limitation all insurance proceeds and refunds of premiums) from any sale or other disposition of the property.[10]

Further, the Deed of Trust defines "Rents" to mean "all present and future rents revenues, income, issues, royalties, profits, and other benefits derived from the [subject] Property."[11]

---

[8] Zions' Brief, Exhibits 7, 8, and 9.

[9] Zions' Brief, Exhibit 2, page 1.

[10] *Id.*, p. 8.

[11] *Id.*

● The Assignment of Rents provides in relevant part:

For valuable consideration, Grantor hereby assigns, grants a continuing security interest in, and conveys to Lender all of Grantor's right, title, and interest in and to the Rents from [the Property].[12]

The Assignment of Rents defines "Rents" as meaning:

all of Grantor's present and future rights, title, and interest in, to and under any and all present and future leases, including, without limitation, all rents, revenue, income, issues, royalties, bonuses, accounts receivable, cash or security deposits, advance rentals, profits and proceeds from the Property, and other payments and benefits derived or to be derived from such leases of every kind and nature, whether due now or later, including without limitation Grantor's right to enforce such leases and to receive and collect payment and proceeds thereunder.[13]

● The Security Agreement provides in part:

**COLLATERAL DESCRIPTION**.   The word "Collateral" as used in this Agreement means the following described property, whether now owned, hereafter acquired, whether now existing or hereafter arising, and wherever located, in which Grantor is giving to Lender a security interest [unreadable] the payment of the indebtedness and performance of all other obligations under the Note and this Agreement:

**All Furniture, Fixtures and Equipment**

In addition, the word "Collateral" also includes all the following, whether now owned or hereafter acquired, whether now existing or herea[unreadable] arising, and wherever located:

(A) All accessions, attachments, accessories, tools, parts, supplies, replacements of and additions to any of the collateral described her[unreadable] whether added now or later.

(B) All products and products of any of the property described in this Collateral section.

**(C) All accounts, general intangibles, instruments, rents, monies, payments, and all other rights, arising out of a sale, lease,**

---

[12]  Debtor's Brief, Exhibit 2, p. 1; Zions' Brief, Exhibit 3, p. 1.

[13]  *Id.*, p. 5.

**consignm[unreadable] or other disposition of any of the property described in this Collateral section.**

(D) All proceeds (including insurance proceeds) from the sale, destruction, loss, or other disposition of any of the property described in [unreadable] Collateral section, and sums due from a third party who has damaged or destroyed the Collateral of from that party's insurer, whether [unreadable] to judgment, settlement or other process.

(E) All records and data relating to any of the property described in this Collateral section, whether in the form of a writing photogr[unreadable] microfilm, microfiche, or electronic media, together with all of Grantor's right, title, and interest in and to all computer software required [unreadable] utilize, create, maintain, and process any such records or data on electronic media.[14]

## POSITIONS OF THE PARTIES CONCERNING WHETHER ZIONS POSSESSES A SECURITY INTEREST IN THE ROOM REVENUES

The Debtor asserts the Security Agreement does not grant Zions a security interest in room revenue as cash collateral because Zions' debt is not subject to a security interest as provided in § 552(b). Specifically, the Debtor states the description of the collateral in the Security Agreement is insufficient to create an enforceable security interest in the room revenue. The Debtor argues a plain reading of the description leads to the conclusion the interest was granted in the Debtor's physical assets, not "accounts" or "payment intangibles." In support of its position, the Debtor highlights the case of *In re Tri-Growth Ctr. City, Ltd.*[15] wherein a similar description of "furniture, fixtures, and equipment" and "all proceeds thereof" was found not to cover a hotel's room revenue.[16]

In addition, the Debtor contends any alleged interest in the room revenue is not perfected under COLO. REV. STAT. § 4-9-109 and 309, because the Financing Statements do not adequately identify room rents as collateral. The Financing Statements contain descriptions of furniture, fixtures, and equipment and all related proceeds. However, the Debtor asserts:

[S]uch descriptions cannot be reasonably interpreted to encompass the room revenue or put the world on notice of Zions' alleged security interest in accounts or payment

---

[14] Debtor's Brief, Exhibit 3; Zions' Brief, Exhibit 4, p. 1 (emphasis added). It is obvious from the direct quotations from the Exhibit that part of the text is missing. However, for purposes of the matter before the Court, the Court believes the critical words and meanings are discernable, and the missing portions could be "reconstructed" without offense to the critical words and meanings, as more fully described herein.

[15] *In re Tri-Growth Ctr. City, Ltd.*, 133 B.R. 524, 526 (Bankr. S.D. Cal. 1991).

[16] *Id.*, at 526.

intangibles for use of occupancy of rooms at the Property. Thus, even if the description of collateral in the Security Agreement is sufficient to create a security interest in the room revenue, the descriptions in the UCC-1 Financing Statements are inadequate and Zions' alleged security interest is subject to avoidance pursuant to 11 U.S.C. § 544.[17]

Moreover, the Debtor argues the recording of the Assignment of Rents did not perfect Zions' security interest because such assignments should have been recorded with the Secretary of State and not with the Pueblo County Clerk and Recorder, pursuant to COLO. REV. STAT. § 4-9-310. The Debtor maintains the room rents are personal property and must be secured by a financing statement filed with the Secretary of State. Lastly, the Debtor contends since Zions' interest in the room revenues must be perfected pursuant to the provisions of Article 9 of the Uniform Commercial Code, the notice Zions filed under § 546(b) is also ineffective with respect to the room revenue.

Zions, on the other hand, maintains the case law relied upon by the Debtor is outdated in light of the Bankruptcy Reform Act of 1994 (the "1994 Act").[18] Zions points out the 1994 Act included a new § 552(b)(2), intended to benefit lenders on motel and hotel properties. According to Zions, under § 552(b)(2), if a secured creditor's security agreement against the real property of a hotel or motel is valid and perfected, and the security agreement extends to amounts paid as "fees, charges, accounts, or other payments for the use or occupancy of rooms and other public facilities in hotels, motels, or other lodging properties," then the security agreement extends to all such revenues acquired by the estate after the commencement of the case--regardless of state perfection laws--unless the court, after notice and a hearing, and based on the equities of the case, orders otherwise.

Zions also asserts, even if the *Vickers* rule still applies, the descriptions in the Deed of Trust and the Assignment of Rents clearly extend to the motel and to amounts paid as rents. Zions cites cases from the Colorado Court of Appeals for the proposition that security interests in hotel revenues created under deeds of trust and assignments of rights are effective.[19]

## DISCUSSION

Section 363(a) defines "cash collateral"as follows:

---

[17] Debtor's Brief, Docket No. 89, pp. 4-5.

[18] The Debtor cited *Super 8 Motels v. M. Vickers, Ltd. (In re M. Vickers, Ltd.)*, 111 B.R. 332 (D. Colo. 1990). In *Vickers*, Judge Kane of the United States District Court for the District of Colorado concluded room revenues were personalty. However, it should also be noted the Debtor, in support of its assertion hotel room revenue constitutes personal property, also cited a much more recent case, *In re Ocean Place Development, LLC*, 447 B.R. 726, 732 (Bankr. D.N.J. 2011).

[19] *Bank of Am. Nat'l Trust & Savings Ass'n v. Denver Hotel Ass'n Ltd. P'ship*, 830 P.2d 1138, 1141 (Colo. App. 1992); *Great-West Life Assurance Company v. Raintree Inn*, 837 P.2d 267, 270 (Colo. App. 1992).

(a) In this section, "cash collateral" means cash, negotiable instruments, documents of title, securities, deposit accounts, or other cash equivalents whenever acquired in which the estate and an entity other than the estate have an interest and includes the proceeds, products, offspring, rents, or profits of property and the fees, charges, accounts or other payments for the use or occupancy of rooms and other public facilities in hotels, motels, or other lodging properties subject to a security interest as provided in section 552(b) of this title, whether existing before or after the commencement of a case under this title.[20]

In turn, § 552(b)(2) provides:

(2) Except as provided in sections 363, 506(c), 522, 544, 545, 547, and 548 of this title, and notwithstanding section 546(b) of this title, if the debtor and an entity entered into a security agreement before the commencement of the case and if the security interest created by such security agreement extends to property of the debtor acquired before the commencement of the case and to amounts paid as rents of such property or the fees, charges, accounts, or other payments for the use or occupancy of rooms and other public facilities in hotels, motels, or other lodging properties, then such security interest extends to such rents and such fees, charges, accounts, or other payments acquired by the estate after the commencement of the case to the extent provided in such security agreement, except to any extent that the court, after notice and a hearing and based on the equities of the case, orders otherwise.[21]

### Does Zions Have an Enforceable Security Interest?

Rents are "cash collateral" when they are "subject to a security interest as provided in 552(b)."[22]  The concept of "cash collateral" includes the notion a creditor has an enforceable, non-avoidable security interest in the subject collateral.[23]  The fact the 1994 Act gave preference to security interests in rents and room payments held by hoteliers does not create a blanket rule that all hotel room revenues constitute such rents and payments.  In order for them to be so, an enforceable security interest must exist.  The first question the Court must determine, therefore, is whether Zions has an enforceable security interest in the room revenues.  If it does not have an enforceable security interest, its interest in the room revenues is avoidable under § 544 and thus excepted from § 552(b)(2).

---

[20]  11 U.S.C. § 363(a).

[21]  11 U.S.C. § 552(b)(2).

[22]  *Id.*

[23]  *In re Wright Group, Inc.*, 443 B.R. 795, 805 (Bankr. N.D. Ind. 2011) (citing *In re Fricks*, 58 B.R. 883 (Bankr. N.D. Ala. 1986)).

Here, the Deed of Trust and Assignment of Rents state the Lender has a security interest in rents, and define rents as "all present and future rents, revenues, income, issues, royalties, profits, and other benefits derived from the [subject] Property" (Deed of Trust), and "all rents, revenue, income, issues, royalties, bonuses, accounts receivable, cash or security deposits, advance rentals, profits and proceeds from the Property" (Assignment of Rents). Although expansive, such language does not provide a description that creates a clear security interest in "fees, charges, accounts, or other payments for the use or occupancy of rooms and other public facilities in hotels, motels, or other lodging properties" for purposes of § 552(b)(2). As an initial observation, the United States Bankruptcy Court for the District of New Jersey recently evaluated the following similarly broad language, arguably even more expansive than the language in the Loan Documents in this case:

> "Rents" include ". . . all revenues and credit card receipts collected from guest rooms, restaurants, bars, meeting rooms, banquet rooms and recreation facilities, all receivables, customer obligations, installment payment obligations and other obligations now existing or hereafter arising or created out of the sale, lease, sublease, license, concession or other grant of the right of the use and occupancy of property or rendering of services by Borrower or any operator or manager of the hotel or the commercial space located in the Improvements or acquired from others . . . license, lease, sublease and concession fees and rentals, health club membership fees, food and beverage wholesale and retail sales, service charges, vending machines sales and process, if any . . . whether paid or accruing before or after the filing by or against Borrower of any petition for relief under the Bankruptcy Code."[24]

However, the Court found the mere use of the word "rents" in the loan documents before it did not remove the transaction from the application of Article 9 of the Uniform Commercial Code, stating it was "wary of lending support to a creditor's ability to draft itself outside of Article 9's integral protections for obligors and debtors, *e.g.*, redemption rights."[25]

This Court is similarly cautious in using § 552 to remove a transaction from the general conduct of business reflected in the Uniform Commercial Code. However, of greater significance, the Court notes a careful reading of § 552(b) indicates a **security agreement** is the critical instrument that must contain the key language creating the lien interest. Such an interest may not be established in ancillary documents. The Security Agreement in this case links the collateral described to the **disposition**[26] of the Property, not to the **operation** of the property.[27]

---

[24] *Ocean Place Development, LLC*, *supra*, 477 B.R. at 733-734.

[25] *Id.*, at 734.

[26] According to the Meriam-Webster dictionary, "disposition' is defined as:

The act or the power of disposing or the state of being disposed as:
  a: administration, control

In this Court's opinion, revenue derived from operating a hotel does not constitute the "disposition" of property and therefore does not fall within this collateral description.[28]

Accordingly, the Court finds Zions does not have an enforceable security agreement in the room revenues. Therefore, § 552(b)(2) does not apply, and the Court must return to the question in *Vickers*, that is, whether the room revenues may be considered rents, which may be assigned, or personal property, which is subject to the Colorado Uniform Commercial Code.

**Are the Room Revenues Rents or Personal Property?**

In *Vickers*, the Court concluded under Colorado law, profits consisting of room revenues from a debtor's motel business were "personalty," which could be secured by an Article 9 financing statement, rather than "rents," which could be assigned.[29] It noted:

> The bankruptcy court . . . observed that certain Colorado statutes refer to hotel fees as "rents." However, in these statutes, the term is used as a verb to describe the action of providing shelter, and not as a noun to describe the fees for providing such shelter. *See, e.g.* Colo.Rev.Stat. § 38–20–102(2)(1982)("keeper of hotel . . . or any other person who rents temporarily shelter" entitled to lien for amount due for lodging)(emphasis added); *id.* §12–44–101(3)(1985)(statute dealing with public accommodations defining "public establishment" to include "any establishment leasing or renting overnight sleeping accommodations"). A more recently enacted statute defines the term "hotel facility" as "an establishment engaged in the business of furnishing overnight room accommodations primarily for transient persons," and refers to the fees charged by hotel facilities as "rates." *Id.* §§ 18–14–102, 18–14–103 (1986).[30]

Zions contends the 1994 passage of § 552(b)(2) effectively overruled *Vickers* and similar cases, making hotel room revenues "rents," and hence an interest in real property which may be

---

b: final arrangement: settlement <the disposition of a case>
c: (1) transfer to the care or possession of another (2) the power of such transferal
d: orderly arrangement.

[27] Debtor's Brief, Exhibit 3; Zions' Brief, Exhibit 4, p. 1, *supra*. Specifically, this document provides the collateral includes: "All accounts, general intangibles, instruments, rents, monies, payments, and all other rights, arising out of a sale, lease, consignment or other **disposition** of any of the property described in this Collateral section."

[28] It is also important to note the Security Agreement does not include any language which incorporates or adopts any other ancillary document within its coverage.

[29] *Vickers*, *supra*, at 335.

[30] *Id.* It should be noted the Colorado Revised Statute sections cited by *Vickers* have not changed since the date the Vickers opinion was issued.

assigned, by definition.  However, even in the absence of problems with the enforceability of Zions' security interest, as discussed above, the Court does not believe such an absolute conclusion can be reached.  Specifically, in *Ocean Place Development*, the Court found:

> The significance of the plain meaning of the statutory language . . . lies in the general rule that ". . . guests in a hotel . . . are mere licensees and not tenants, and . . . they have only a personal contract and acquire no interest in the realty. . . ."  *In re Greater and Atlantic and Pacific Inv. Group*, 88 B.R. 356, 359 (Bankr. N.D. Okla. 1988) (quoting from 49 Am.Jur.2d Landlord and Tenant 6 (1970)).  *See also DeWolf v. Ford*, 193 N.Y. 397, 86 N.E. 527, 530 (1908)(concluding a room in an inn is not, in a legal sense, the "dwelling house" of a guest, and the relation is not that of landlord and tenant, for notwithstanding the guest's occupancy, it is the house of the innkeeper) . . . It simply would distort the statutory language to hold that a guest in a hotel is a lessee and that the fee paid, although perhaps referred to in common parlance as rent, is rent attributable to a lease.[31]

The Court went on to find:

> [T]he hotel room revenues are "accounts" or "payments intangible" as defined by Article 9.  *See also In re Northview Corp.*, 130 B.R. 543 (9th Cir. BAP 1991) (characterizing hotel revenues as personal property characterized as an "account" or "payment intangibles" rather than rent).  The hotel occupants of Ocean Place are not "tenants" who possess an interest in real property, but merely licensees. Therefore, as a secured creditor, all the Debtor must do is establish that AFP's interests are adequately protected.
>
> 　　　　. . .
>
> Moreover, the Official Comments to the UCC, which clarify and relate the philosophy undergirding Article 9, further support the Court's construction. In particular, the Official Comment to Section 9–101 states:
>
> > The growing complexity of financing transactions forces us to keep piling new statutory provisions on top of our inadequate and already sufficiently complicated nineteenth-century structure of security law . . . The aim of this Article is to provide a simple and unified structure within which the immense variety of present-day secured financing transactions can go forward with less cost and with greater certainty. Under this Article the traditional distinctions among security devices, based largely on form, are not retained; the Article applies to all transactions intended to create security interests in personal property and fixtures.

---

[31] *Ocean Place Development, supra.*, at 732 (quoting *In re Kearney Hotel Partners v. Richardson*, 92 B.R. 95 (Bankr.S.D.N.Y.1988)).

*Id*. (emphasis added).  Furthermore, with respect to the scope of Article 9, the Official Comment to Section 9–109 provides: "When a security interest is created, this Article applies regardless of the form of the transaction or the name that the parties have given to it."  *Id.*  The Court is persuaded that the preceding commentary suggests that the UCC drafters intended that courts look beyond the labels given by the parties when determining whether the UCC, specifically Article 9, is applicable in any given proceeding.[32]

This Court agrees with the reasoning set forth in *Ocean Place*, and finds, based on the analysis of the Loan Documents set forth above, the room revenues in the instant case constitute personal property, subject to the Uniform Commercial Code, not real property, which can be assigned.  It should be noted this finding is specific to the facts of this case and the documents involved.  In light of the great diversity of financial transactions entered into by debtors and creditors, it would be premature, if not foolhardy, to create a hard and fast rule that is not dependent on the particular circumstances and documentation of each case.  It should also be noted the Deed of Trust and Assignment of Rents in this case contain the description including "rents" in the sections of the documents devoted to describing personal property collateral.[33]

Lastly, the Court finds unpersuasive Zions' contention the Colorado Court of Appeals' *Great West Life* case repudiates *Vickers*.[34]  Specifically, the *Great West* Court stated:

The question presented is one which has not been previously addressed by Colorado courts, *i.e*., a determination of the scope of the specific language contained in the documents here.  *See In re Vickers*, 111 B.R. 332 (D. Colo. 1990)

Resolution of this question must turn upon a determination of the parties' intent as expressed in those documents.  Accordingly, appropriate rules of contract construction will be employed to decide the rights and liabilities of the parties.  *See Fibreglas Fabricators, Inc. v. Kylberg*, 799 P.2d 317 (Colo. 1900).

When the language of a contract is clear and unambiguous, rules of construction cannot be applied to vary the meaning of its terms.  *Alexander Dawson, Inc. v. Fling*, 155 Colo. 599, 396 P.2d 599 (1964).  The object of construction is rather to ascertain and effectuate the parties' mutual intent based on the language of the contract itself.  *In re May*, 756 P.2d 362 (Colo. 1988).

---

[32]  *Id.*, at 732-733.

[33]  See the discussion of the effect of expansive language contained in *Ocean Place*, above, in which the Bankruptcy Court determined the expansive definition of "rents" was not dispositive.

[34]  *Great-West Life Assur. Co. v. Raintree Inn*, 837 P.2d 267 (Colo. App. 1992).

The mere fact that the parties dispute the legal effect of contract terms, however, does not render their meaning uncertain for purposes of construction. *Rodriguez v. Safeco Insurance Co.*, 821 P.2d 849 (Colo. App. 1991). Only when reasonably susceptible of more than one interpretation are contract terms considered to be uncertain or ambiguous. *Davis. v. M. L. G. Corp.*, 712 P.2d 985 (Colo. 1986).

A similar approach in the interpretation of assignment clauses has been displayed by a bankruptcy court in proceedings to adjudicate rights to hotel revenues. *In re Drake Hotel Associates*, 131 B.R. 156 (Bankr. N. D. Cal. 1991). According to this holding, a lien exists when language of the assignment (or deed of trust) plainly reflects an intent to include those revenues directly arising from the conduct of business operations on mortgaged premises. This principle is based on a desire to assure payment of the underlying debt from sources the parties reasonably would anticipate to arise from actual use of the property.

We are aware of the considerable line of cases in the bankruptcy field which address the nature of hotel revenue and its character under a deed of trust or assignment of rents. As a general rule, these cases hold that hotel revenues are personal property, and not rents. Accordingly, the usual language of a commercial mortgage or deed of trust which provides for an assignment of the "rents, issues, and profits" of the mortgage property to the lender does not create a security interest in such revenues. *In re Tri-Growth Centre City, Ltd.*, 133 B.R. 524 (Bankr. S. D. Cal. 1991); *In re Nendels-Medford Joint Venture*, 127 B.R. 658 (Bankr. D. Or. 1991); *In re Shore Haven Motor Inn, Inc.*, 124 B.R. 617 (Bankr. S .D. Fla. 1991); *In re Sacramento Mansion, Ltd.*, 117 B.R. 592 (Bankr. D. Colo. 1990) (applying California law); *In re M. Vickers, Ltd.*, *supra*;  *In re Investment Hotel Properties, Ltd.*, 109 B.R. 990 (Bankr. D. Colo. 1990) (applying Missouri law); *In re Ashkenazy Enterprises, Inc.*, 94 B.R. 645 (Bankr. C. D. Cal. 1986); *In re Greater Atlantic & Pacific Investment Group, Inc.*, 88 B.R. 356 (Bankr. N. D. Okla. 1988).

However, these cases generally address competing claims of creditors and the application of Article Nine of the Uniform Commercial Code in support of some of those competing claims, or are based on long recognized distinctions between the relation of landlord-tenant on the one hand and innkeeper and guest on the other, and the fact that the language of the assignment clause at issue was narrowly drafted so as not to encumber the mortgagor's business.[35]

The documents before this Court contain language different from the language evaluated in Great West. The language in the Loan Documents in this case, by its clear meaning did not create a security interest in the room revenues of the subject property. Rather, here the Loan Documents treated room revenues as personalty, even if described as "rents." In addition, as

---

[35] *Id.*, at 270-271

discussed above, the language of the Loan Documents does not plainly reflect an intent to include in the lien those revenues directly arising from the conduct of business operations. Therefore, neither *Great West* nor *Drake Hotel* can be used for the blanket proposition that all hotel room revenues constitute "rents" for purposes of Colorado law.

Therefore, in this case, the room revenues are not subject to an enforceable security interest that would bring them within the application of § 552. In addition, they are not real property subject to assignment. For these reasons, the room revenues do not constitute cash collateral.

**IT IS THEREFORE ORDERED** Zions' *Motion to Prohibit Use of Cash Collateral* is DENIED.

**IT IS FURTHER ORDERED** the Debtor's *Motions for Authority to Use Cash Collateral* are denied as moot.

Dated October 24, 2011                                      BY THE COURT:

Michael E. Romero
U.S. Bankruptcy Judge