

Signed/Docketed
December 30, 2011

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF COLORADO
### The Honorable Michael E. Romero

In re:                                      )
                                            )   Case No. 11-24718 MER
H.T. PUEBLO PROPERTIES, LLC                 )
                                            )   Chapter 11
            Debtor.                         )

## ORDER

The matter before the Court concerns the Debtor's sole asset, the Ramada Inn
Pueblo, a motel located in Pueblo, Colorado.  The circumstances of this case reveal the
unfortunate but all too-common scenario of a buyer who paid too much for a property,
and was unable to service the debt on the purchase.  The facts, as set forth below,
demonstrate the property is significantly "underwater," and the Debtor has no
reasonable prospect of reorganization nor the ability to provide adequate protection to
the holder of the first lien on the property, warranting relief from stay.

## BACKGROUND FACTS

H.T. Pueblo Properties, LLC (the "Debtor"), is owned by 88% by Mr. Michael Hu
and 12% by his wife.  On or about May 30, 2007, the Debtor purchased the subject
property, located at 4703 N. Freeway Road, Pueblo, Colorado (the "Property"), for
approximately $5,128,000.

On June 21, 2011, the Debtor filed its voluntary Chapter 11 petition.   The
Debtor's schedules list the value of the Property as $2,099,905.  Zions First National
Bank ("Zions") holds a promissory note from the Debtor in the face amount of
$2,614,800, secured by a first deed of trust on the property, an assignment of rents, and
a commercial security agreement.[1]  The balance due on Zions' note as of the petition
date was $3,073,639.55.[2]  In addition, the Debtor's Schedule D shows a second note
and deed of trust held by the United States Small Business Administration in the
amount of $1,745,463.97, and a third note and deed of trust held by Huafu Jiang and
Jie Wu in the amount of $250,000, as well as secured property taxes owed to the
Pueblo County Tax Assessor in the amount of $170,330.38 for which a tax sale has

---

[1]  The Note was originally held by Choice Bank, but was sold to Zions on June 8, 2007, together
with assignments of the security documents.

[2]  At the hearing, Zions asserted the current balance owing is $ 3,256,000.

occurred and a tax lien certificate issued.  Thus, according to the Debtor's schedules, as of the petition date, there was $5,239,431.90 in debt against the Property, leaving a $3,139,526.90 unsecured deficiency, $1,144,062 of which was owed to Zions.

## MOTIONS BEFORE THE COURT

### A.   Motion for Relief from Stay

On September 23, 2011, Zions filed its Motion for Relief from Stay[3] (the "Stay Motion"), to which the Debtor objected.[4]  The Stay Motion notes the Debtor's schedules state the value of the real property on the petition date was $2,099,905, with the value of the personal property "unknown."[5]  Zions argues there is no equity in the Property, and further, the value of the Property is declining.

Zion also asserts the Chapter 11 case was filed in bad faith.  First, although the Debtor first consulted Sender & Wasserman, P.C. no later than June 6, 2011 (the date it paid the firm a retainer), the Debtor waited to file its petition until June 21, 2011, one day before a foreclosure sale scheduled on Zions' Deed of Trust. The Debtor filed this bankruptcy case to stop the foreclosure sale.  Second, Zion's alleges Mr. Hu owns 88% of the membership interests of the Debtor and 100% of the membership interest of an affiliate, Young Star, LLC ("Young Star").  Between April 1, 2010, and the Petition Date, the Debtor transferred $95,400 to Young Star.  Moreover, on June 20, 2011 - the day before the Petition Date - the Debtor transferred $15,000 to Young Star.  These transfers were not disclosed, nor were the Debtor's claimed debts to Young Star.  In addition, Zions alleges the Debtor made false statements regarding the source of a $25,000 retainer paid to its bankruptcy attorneys. The Debtor indicated the $25,000 came from Mr. Hu, but instead, it came from the proceeds of the Debtor's business.  In addition, Zions states the Debtor's Schedule F lists Mr. Hu as being owed $80,000, but that debt does not appear in the Debtor's prepetition financial statements.

Zions alleges the Debtor has no reasonable possibility of a successful reorganization within a reasonable time.  Specifically, the Debtor's annual revenues have been declining significantly since 2009, and it has not paid its annual franchise fees to Ramada Inn International ("Ramada") since May 2010, with the result it owes that entity approximately $115,000 in delinquent franchise fees.  Moreover, the Debtor

---

[3] Docket No. 110.

[4] Docket No. 119.

[5] At the final relief from stay hearing, counsel for the Debtor stipulated the current value of the Property is $1,850,000.

is behind on payments of federal wage withholding taxes, federal unemployment taxes, state wage withholding taxes, state unemployment taxes, state sales taxes and city sales taxes.

Zions notes the Pueblo treasurer sold the 2008 tax lien on October 15, 2009. In October of 2012, the holder of the tax certificate may apply for a Treasurer's Deed, unless the Debtor pays all delinquent real estate taxes, which by then will be in the range of $200,000. Finally, Zions also states the Hus are guarantors of the Debtor's obligation to Zions, and Zions commenced a civil action against them to recover on their guaranties. In response, Mr. Hu and Ms. Hu jointly filed their own Chapter 11 bankruptcy case, Case No. 11-32313- MER. Therefore, Zions argues, it is extremely unlikely the Hus could contribute funds to the Debtor, which would be necessary to make any proposed plan of reorganization feasible.

For these reasons, Zions states it will not support any plan proposed by the Debtor because the Debtor has demonstrated it cannot reorganize, and particularly notes it will object to any plan in which the Debtor's insiders, Mr. and Mrs. Hu, retain any ownership interest in the Debtor. Therefore, Zions argues, without significant new investment, the absolute priority rule will prevent the Debtor's current members from keeping their current ownership interests.

Accordingly, Zions argues it is entitled to relief from stay for cause pursuant to 11 U.S.C. § 362(d)(1),[6] because of the Debtor's bad faith in filing this Chapter 11 case and lack of adequate protection of Zions' interests in the Property. In addition, Zions asserts it is entitled to relief pursuant to § 362(d)(2) because 1) the Debtor does not have any equity in the Property and 2) the Property is not necessary to an effective reorganization, *i.e.*, there is no "reasonable possibility of a successful reorganization within a reasonable time."[7]

Although the Debtor agrees that the aggregate amount of the liens against the Property is in excess of the value of the Property itself, the Debtor adamantly argues the Property is necessary to the Debtor's reorganization that is in prospect. Specifically, the Debtor alleges secured claims should be limited to the value of the Property. The Debtor contends this means approximately $3,200,000 out of $5,239,431.90 in "secured" claims against the Property will be treated as unsecured claims.

Through its proposed plan, the Debtor also intends to modify the terms of the remaining secured debt. With its secured debt payments reduced, the Debtor believes

---

[6] Unless otherwise noted, all future statutory references in the text are to Title 11 of the United States Code.

[7] Stay Motion, ¶31, p.5.

its business will generate sufficient funds to pay its secured creditors during the term of its plan of reorganization.  The Debtor maintains although the hotel industry as a whole is seasonal and the Debtor has been detrimentally affected by the decline in the general economy over the recent past, it claims its prospects are improving.  Specifically, since the Petition Date, the Debtor's revenue has significantly outpaced its operating expenses.  In addition, as a result of the Debtor's improved business practices and new marketing strategies, the Debtor alleges it has enjoyed an increase in profits.

As of the date of filing, the Debtor had $8,000 in its bank account, but held cash reserves of over $140,000 as of September 30, 2011.  The Debtor asserts its average monthly income available to service secured debt will be approximately $20,000 a month going forward as shown by the Debtor's recent performance.  Therefore, according to the Debtor, if the secured claims against the Debtor are limited to the value of the Property, the Debtor will need $11,691.80 a month to make payments on its secured debt if it is amortized over a 25-year period at 5% interest with a five-year call. The Debtor's anticipated average monthly gross profits of $20,000 a month would be enough to make such payments in addition to payments toward any delinquent taxes and franchise fees.

Additionally, the Debtor argues Zions is adequately protected because the value of the Property and the Debtor's cash reserves are increasing, not decreasing.  In addition, the Debtor contends its bankruptcy was filed in good faith as shown by the reasonable probability of the Debtor's successful reorganization.  The Debtor argues Zions' assertion there is no reasonable possibility of a successful reorganization within a reasonable time is unrealistic based upon the increase in the Debtor's cash reserves since the Petition Date and current state of the Debtor's business.

Finally, the Debtor contends its Chapter 11 petition was filed in good faith, as shown by the following factors: 1) the pre-petition conduct of the Debtor has not been improper; 2) there is a large amount of unsecured debt; 3) the debtor is not evading court orders; 4) the Debtor has an ongoing business and employs 16 people; and 5) there is a strong possibility of a successful reorganization.  With respect to Zions' allegations the Debtor's pre-petition transfers to Young Star, LLC evidence bad faith, the Debtor responds that in the months between September 22, 2009 and the Petition Date, Young Star, LLC transferred $118,000 to the Debtor.  During the same period of time, the Debtor transferred $114,500 to Young Star, LLC.  The Debtor contends such transfers were simply intercompany loans used to alleviate cash flow problems during challenging economic times.  In addition, the Debtor states it has rectified the misunderstanding surrounding the payment of its attorneys' retainer, and filed a Revised Motion to Approve Retainer.

**B.      Motion For Adequate Protection**

Zions filed its *Motion for Adequate Protection* (Docket No. 69) on August 31, 2011 ("the Adequate Protection Motion").  The Adequate Protection Motion asserts simply that the Debtor is using the Property and has expressed the intention to cease monthly payments to Zions in the absence of a court order.

## DISCUSSION

**A.      Stay Motion**

Section 362(d) sets forth the grounds for relief from the automatic stay:

(d) On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying, or conditioning such stay -

(1) for cause, including the lack of adequate protection of an interest in property of such party in interest; or

(2) with respect to a stay of an act against property, if -

(A) the debtor does not have an equity in such property; and

(B) such property is not necessary to an effective reorganization.[8]

Upon filing a relief from stay motion, the initial burden going forward to show the grounds that compel the lifting of the stay rests with the creditor.[9]  Once grounds have been established, the moving party need only prove the issue of lack of equity in the property.  The burden of proof rests with the debtor as to all other issues.[10]

---

[8]  11 U.S.C. § 362(d)

[9]  *In re Anthem Communities*, 267 B.R. 867, 870-871 (Bankr. D. Colo. 2001).

[10]  11 U.S.C. § 362(g).

1.     *Cause Under § 362(d)(1)*

a.     Adequate Protection

With respect to § 362(d)(1), the purpose of providing adequate protection is to insure that a creditor receives the value for which it bargained pre-bankruptcy.[11] Adequate protection assures a creditor its collateral is not depreciating or diminishing in value and is evaluated on a case-by-case basis.[12]  For the reasons stated in its discussion of the Adequate Protection Motion, below, the Court finds Zions has proven a past decline in value and the threat of a future decline in value of the Property, thus establishing a *prima facie* case of lack of adequate protection.[13]

b.     Bad Faith

Determining whether a bankruptcy filing is in bad faith requires evaluation of the debtor's financial condition, motives, and the local financial realities.[14]  Findings of bad faith in proceedings based on §§ 362(d) or 1112(b) have been predicated on certain recurring but non-exclusive patterns, and are based on a conglomerate of factors rather than on any single event.[15] The Tenth Circuit Court of Appeals has identified several factors which support a finding of bad faith:  1) the debtor has only one asset; 2) the debtor has only one creditor; 3) the debtor acquired property which was posted for foreclosure and the prior owners had been unsuccessful in defending against the foreclosure; 4) the debtor was revitalized on the eve of foreclosure to acquire the insolvent property; 5) the debtor has no ongoing business or employees; 6) the debtor lacks a reasonable possibility of reorganization; and 7) the Chapter 11 filing stopped the foreclosure.[16]  However, this list of factors, drawn from *Little Creek, Nursery Land*, and similar cases, is not exhaustive.  Individual factors, in and of themselves, may not lead to a conclusion a bankruptcy filing is in bad faith.  Bad faith is found when the

---

[11]  *In re O'Connor*, 808 F.2d 1393, 1396 (10th Cir. 1987).

[12]  *Id.*, at 1397.

[13]  *See Anthem Communities, 267 B.R. at 871; In re Elmira Litho, Inc.*, 174 B.R. 892, 902 (Bankr. S.D. N.Y. 1994).

[14]  *Matter of Little Creek Development Co.*, 779 F.2d 1068, 1072 (5th Cir. 1986); *see also In re Nursery Land Development, Inc.*, 91 F.3d 1414, 1416 (10th Cir. 1966); *In re Pacific Rim Investments, LLP*, 243 B.R. 768, 772 (D. Colo. 2000).

[15]  *Little Creek*, *supra*, at 1072.

[16]  *Nursery Land*, *supra*, at 1416.

cumulative effect of these or other factors leads to the inescapable conclusion that use of the bankruptcy laws by the debtor is inappropriate.[17]

Here, the Court finds the evidence, primarily Mr. Hu's testimony, shows a debtor whose owner got in over his head, and who unwisely transferred funds between different properties. Mr. Hu satisfactorily explained his mistakes in disclosing the source of the payment made to the Debtor's attorneys, and willingly conceded he transferred funds between properties, stating such transactions resulted in a "wash" rather than unwarranted gains. The factual picture painted is not of a debtor using the bankruptcy laws inappropriately, but of a debtor's owner who continued unwise financial practices in preparation for and after filing the Chapter 11 petition. Thus, although the Court could hope for Mr. Hu to adopt better business practices in future endeavors, it cannot find the Debtor's actions in this case constitute bad faith.

2.   *Lack of Equity and Lack of Necessity for an Effective Reorganization Under § 362(d)(2)*

Generally, valuation to determine equity forms a key part of the analysis of motions brought under § 362(d).[18] In this case, the Debtor has agreed there is no equity in the Property. The question then becomes whether the Property is necessary for an effective reorganization that is in prospect. The Property is the Debtor's major asset, and clearly it cannot reorganize without it. However, this alone is not sufficient to deny a relief from stay motion.[19] Rather, as the Supreme Court has stated, to show a property is necessary fo an effective reorganization requires:

[N]ot merely a showing that if there is conceivably to be an effective reorganization, this property will be needed for it; but that the property is essential for an effective reorganization that is in prospect. This means, as

---

[17] *In re Gunnison Center Apartments, LP,  320 B.R. 391, 400 (Bankr. D. Colo. 2005) (citing In re Plumberex Specialty Products Inc.*, 311 B.R. 552, 560 (Bankr. C.D. Cal. 2004); *In re Kasdorf*, 64 B.R. 294, 295 (Bankr. D. Colo. 1986)).

[18] *See In re YL West 87th Holdings I, LLC*, 423 B.R. 421, 428 (Bankr. S.D. N.Y. 2010) ("In making its determination with respect to valuation, a court should sift through the appraisal and testimony and make a judgment as to the 'accuracy and credibility' of the appraisers.").

[19] *Gunnison, supra,* at 401 (citing *In re Holly's, Inc.,* 140 B.R. 643, 703-704 (Bankr. W.D. Mich. 1992); *Albany Partners Ltd. v. Westbrook*, 749 F.2d 670, 673 n. 7 (11th Cir. 1984) ("the mere fact that the property is indispensable to the debtor's survival is insufficient.")).

many lower courts . . . have properly said, that there must be "a reasonable possibility of a successful reorganization within a reasonable time."[20]

Here, the Debtor filed a proposed plan on December 6, 2011[21] (the "Plan"). The Plan proposes the Reorganized Debtor will pay unsecured creditors from the Property's cash flow over five years, beginning on September 1, 2013. Unsecured creditors, including Mr. and Mrs. Hu, are divided into eleven classes, to receive essentially 25% of funds remaining after paying priority taxes and Zions. However, at trial, Mr. Hu conceded the unsecured creditors are not anticipated to receive any payment.

The Plan also provides the Hus' interests will be canceled and transferred to a creditors' trust. The Hus may buy back the transferred interests over the course of the Plan if the Debtor pays as much or more than the projected payments to a "net profits fund." The Plan says a trustee will be appointed to manage the creditors' trust, but does not identify this individual. In addition, Mr. Hu will have the authority to vote any creditors' trust membership interests that he buys back post-confirmation in the daily operation of the business.

The Plan cannot be confirmed for several reasons. First, the Plan does not appear to be feasible. Specifically, while the parties dispute the exact economic situation and prospects of the City of Pueblo, the most optimistic view, that of Mr. Hu, supports a finding the Pueblo economy, particularly in the area of tourism, will remain stable for the foreseeable future. Although the city is attempting to revitalize the economy, and although events attracting tourists already exist and new events are planned, there is no evidence such events will provide the dramatic growth or large increase in tourism needed to reach the increases in income projected by the Debtor.[22]

The Plan proposes the reorganized Debtor will make monthly payments over five years from the petition date, at 4.25% interest, on its $175,981.44 pre-petition property tax debt. In addition, the reorganized Debtor will make monthly payments of $10,366.10 to Zions, representing the amortization of the $1,674,018.56 equity in the property over 20 years at a 4.25% interest rate. Further, the Plan proposes the reorganized Debtor will make monthly payments of $2,475.47 to Ramada over 48 months, to cure its $118,822.78 pre-petition arrearage on franchise payments. Thus, before any funds

[20] *United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365, 370 (1988). Although Timbers involved a question under § 362(d)(1), it nevertheless provided the framework and analysis for evaluating relief from stay motions filed under (d)(2).

[21] Docket No. 165.

[22] See Debtor's Exhibit F, Financial Projections from November, 2011 through October, 2012.

could be contributed to the admittedly ephemeral[23] "Net Profits Fund" for the creditors' trust, approximately $15,899.25 in monthly payments would have to be made to the City of Pueblo, Zions, and Ramada.

The Debtor's projections cover only the period from November 2011 through October 2012.[24]  Over this period, the Debtor projects gross income of approximately $1,025,330 or an average of $85,444.16 per month.  The plan payments are included in the Debtor's expenses, and are estimated at $18,000 per month.  As Mr. Hu noted, the winter and early spring months are slow, and the projections reflect monthly operating losses totaling $96,844 for November, 2011 through April, 2012, with the Debtor's cash reserves declining from $130,000 to $35,811.  In May, 2012 through July, 2012, however, the Debtor's projections indicate positive net income of $24,785, $42,155, and $30,710, respectively, with smaller positive net incomes through October, 2012.

If accurate, these projections would be second only to those results achieved in 2008, its best year under the Debtor's ownership.[25]  However, based on the Debtor's more recent performance, improvement of income to meet plan expectations is highly speculative.  Additionally, given the relatively static nature of the Pueblo economy, the basis for the projected increases is shaky at best.  Optimistic and speculative projections, lacking basis in the Debtor's actual performance numbers, cannot form the basis for an effective reorganization plan that is in prospect.[26]

Nevertheless, even assuming the accuracy of the Debtor's financial projections and assertion of the ability to make payments under the Plan, the proposed Plan cannot be confirmed.  Specifically, the proposed Plan violates the so-called "absolute priority" rule.  In order for a plan to be confirmed, § 1129(a)(8) requires with respect to each class of claims or interests – (A) such class has accepted the plan; or (B) such class is not impaired under the plan.  The Plan provides Classes 2A and 2B, the secured claim and the unsecured claim of Zions, are impaired.  Zions has indicated it will not accept the Plan.  Therefore, the Plan fails to comply with § 1129(a)(8).  However, § 1129(b)(1) (the so-called "cram down" provision), indicates, despite the failure to meet the requirements of § 1129(a)(8), a plan shall be confirmed if it does not "discriminate unfairly, and is fair and equitable" with respect to the impaired classes that have

---

[23] As noted, Mr. Hu conceded unsecured creditors would receive nothing.

[24] Debtor's Exhibit F.

[25] Compare Debtor's Exhibit F projections to the historical income referenced in Zion Exhibit 51.

[26] *In re DB Capital Holdings, LLC*, 454 B.R. 804, 820 (Bankr. D. Colo. 2011) (citing *Gunnison*, 320 B.R. at 403).

rejected the plan.[27]  The "fair and equitable" requirement under § 1129(b)(2)(B) includes the absolute priority rule.

The absolute priority rule was defined by the Supreme Court's opinion in *Case v. Los Angeles Lumber Co, Ltd.*[28]  In 1978, Congress incorporated the absolute priority rule in § 1129(b)(2)(B)(ii), which provides if a rejecting class of unsecured claims is not paid in full, then "the holder of any claim or interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or interest any property."[29]

In the Plan, the Hus will have their interests canceled.  However, they will have the opportunity to "buy back" portions of the creditor's trusts–essentially to buy back their interests in the Debtor, if certain payment levels are reached.  This opportunity constitutes a thing of value–property–that they will receive under the Plan without paying the unsecured creditors in full and as such, is a a violation of the absolute priority rule.  The only way to avoid this result is if the so-called "new value exception" applies to the buy-back proposal.

The new value exception has been constructed by courts to find an interest holder in a Chapter 11 debtor whose plan violates the absolute priority rule may in some circumstances retain the interest because they provide "new value" to the Debtor, in the form of new capital or similar contributions.[30]  In *LaSalle*, the Supreme Court found pre-bankruptcy equity holders could not receive ownership interests in a reorganized entity when the opportunity to contribute new capital and receive such interests was given exclusively to the pre-bankruptcy equity holder, without allowing third parties a chance to bid for such equity or to propose a competing plan.[31]  Essentially, therefore, the Supreme Court found the reorganized entity must be subjected to a market valuation, rather than simply allowing the old equity to repurchase its interests.[32]

----

[27]  11 U.S.C. § 1129(a)(8).

[28]  *Case v. Los Angeles Lumber Co., Ltd.*, 308 U.S. 106 (1939).

[29]  11 U.S.C. § 1129(b)(2)(B).  *See also In re Red Mountain Machinery Co.*, 448 B.R. 1, 13-14 (Bankr. D. Ariz. 2011).

[30]  *See Bank of America National Trust and Savings Association v. 203 North LaSalle Street Partnership*, 526 U.S. 434, 444–49 (1999).  The Court determined a Chapter 11 plan's grant of an exclusive option to purchase a debtor's new equity interests on terms fixed by the debtor constituted valuable "property." *Id.*, at 454–55.

[31]  *Id.*, at 454.

[32]  *Id.*, at 443 (citing *Travelers Insurance Company v. Bryson Properties XVIII*, 961 F.2d 496 (4th Cir.1992).

The Plan proposed by the Debtor here does not meet the requirements of *LaSalle*. Only the Hus are permitted to "buy back" their interests in the Debtor and its business through the reorganized entity of the creditors' trust. Other unsecured creditors or third parties are not provided such an opportunity. Therefore, the Plan cannot be confirmed over the rejection of Zions or any of the other unsecured creditors, because it violates the absolute priority rule and cannot meet the requirements of the new value exception.[33]

Finally, the Court notes the exclusivity period for the Debtor has expired. The Property has been shown to be decreasing in value, and no new infusion of operating capital has been identified. The value of the Property is exceeded by the secured debt of Zions alone by at least $1 million, and Zions has stated it will not accept a plan which provides for less than its full debt payment. Therefore, under the analysis above, the Debtor, in the absence of additional financing, will be unable to propose a confirmable plan.

## B.    Motion For Adequate Protection

In bankruptcy proceedings, a secured creditor ordinarily has a statutory right to adequate protection payments to protect its interests against the diminution in value of its security. Section 363(e) provides:

> Notwithstanding any other provision of this section, at any time, on request of an entity that has an interest in property used, sold, or leased, or proposed to be used, sold, or leased, by the trustee, the court, with or without a hearing, shall prohibit or condition such use, sale, or lease as is necessary to provide adequate protection of such interest. This subsection also applies to property that is subject to any unexpired lease of personal property (to the exclusion of such property being subject to an order to grant relief from the stay under section 362).

In addition, pursuant to § 363(p)(1), the trustee (in this case, the Debtor as debtor-in-possession) has the burden of proof on the issue of adequate protection.

---

[33] As mentioned by Zions' counsel, Zions could elect, under § 1111(b), to forego having the undersecured part of its claim treated as an unsecured claim, and obtain the right to be paid the total amount of its secured claim over time. *See Matter of Greystone III Joint Venture*, 995 F.2d 1274 (5th Cir. 1991) ("Generally, the creditor may elect recourse status and obtain the right to vote in the unsecured class, or it may elect to forego recourse to gain an allowed secured claim for the entire amount of the debt."). In this event, as noted above, the Debtor has not shown the ability to make such payments, and the Plan would remain unconfirmable. *See In re Seasons Partners, LLC*, 439 B.R. 505, 510 (Bankr. D. Ariz. 2010) (Where a secured creditor elects to be treated as fully secured under § 1111(b)(2), the only relevant issue becomes whether the Debtor's Plan to pay it the full amount of the claim, over time, is feasible.).

The purpose of adequate protection is to guard a secured creditor against any decrease in the value of its collateral resulting from depreciation, destruction or the debtor's use of the collateral.  Some of the indicators showing the need for adequate protection are diminution in the value of the property, continuing increase in the amount of the secured debt through the accrual of interest, failure to pay taxes, failure to maintain insurance, or failure to maintain the property.[34]

At trial, Zions' expert, Michael Cowart, testified he performed an appraisal of the property in December 2010, and another appraisal as of August 31, 2011, and found the property had declined in value $225,000 in the time between appraisals.  Although Mr. Hu stated he disagreed with Mr. Cowart's conclusions, and asserted the property is not declining in value, he offered no credible testimony as to why this would be true. Moreover, the Debtor's projections are overly optimistic and speculative, and not based on the Debtor's recent past and present performance.  Such projections cannot demonstrate adequate protection pursuant to § 361.[35]  Therefore Mr. Cowart's testimony as to the decline in value was unrebutted by the Debtor.

Based on Mr. Cowart's findings, Zions calculated the Property was declining in value by $28,125 per month ($225,000 divided by the eight months between December 2010 and August, 2011).  Using the same figures, Zions states the Property has declined in value $154,688 since the petition date of June 21, 2011 ($28,125 multiplied by five and one-half months).

---

[34] Section 361 provides guidance as to what may constitute adequate protection:

When adequate protection is required under section 362, 363, or 364 of this title of an interest of an entity in property, such adequate protection may be provided by–

> (1) requiring the trustee to make a cash payment or periodic cash payments to such entity, to the extent that the stay under section 362 of this title, use, sale, or lease under section 363 of this title, or any grant of a lien under section 364 of this title results in a decrease in the value of such entity's interest in such property;

> (2) providing to such entity an additional or replacement lien to the extent that such stay, use, sale, lease, or grant results in a decrease in the value of such entity's interest in such property; or

> (3) granting such other relief, other than entitling such entity to compensation allowable under section 503(b)(1) of this title as an administrative expense, as will result in the realization by such entity of the indubitable equivalent of such entity's interest in such property.

[35] *DB Capital*, *supra*, at 818 (citations omitted).

Zions noted it was paid $17,600 pursuant to the Court's Order for interim use of cash collateral.  Zions contends it should be paid $137,021 ($154,688 less $17,600) as adequate protection for the past decline in the value of the Property, plus $28,125 per month going forward, to provide it with adequate protection for future loss of value.

The Court finds the testimony of Zions' expert to be credible and attempts at rebuttal to be unsuccessful.  The testimony establishes a decline in value of the Property from the date of the petition to the present, of $154,688.  Based on the Debtor's failure to offer any payments, replacement liens, or other forms of adequate protection to Zions, and based on the parties' agreement the Debtor has no equity in the property with which to offer adequate protection based on an "equity cushion," the Court finds Zions is entitled to an award of adequate protection from the outset of the case to the present, based on the Debtor's use of the real property for its business.  The evidence before the Court, as calculated above, shows $137,021 remains of the decline in value from the petition date.  The Court finds this amount should be awarded as adequate protection pursuant to the requirements of § 363.  In addition, until Zions has obtained possession of the Property pursuant to the grant of the Stay Motion, payments in the amount of $28,125 per month going forward are appropriate.

For the above reasons

IT IS ORDERED Zion's Motion for Adequate Protection is GRANTED, and the Debtor shall pay Zions $137,021 as adequate protection, plus $28,125 per month as long as the Debtor remains in possession of the Property.

IT IS FURTHER ORDERED Zions' Motion for Relief from Stay is GRANTED under both § 362(d)(1) and (2), as the Debtor has failed to meet its burden under § 362(g).

Dated December 30, 2011                    By the Court:

                                           _____
                                           Michael E. Romero
                                           United States Bankruptcy Judge